**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR A SEARCH WARRANT FOR THE CHEEK CELLS/SALIVA (BUCCAL SWAB) OF KEVIN AGUILAR, DOB 6/12/1992, PDID#623621** | : | **Mag. No. _____________** <br> **FILED UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Chad M. Fleming, Special Agent (SA) with the Federal Bureau of Investigation (FBI), Washington Field Office (WFO), Washington, D.C., (hereinafter the "affiant") being duly sworn, deposes and states as follows:

## GENERAL BACKGROUND

1. I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2. I have been a Special Agent with the FBI since July of 2009, where I am currently assigned to squad CR-2 at the Washington Field Office (WFO). Squad CR-2 is responsible for conducting violent crime investigations in the Washington, D.C. area. Through my employment with the FBI, I have personally participated in the investigations of hundreds of alleged violations of the criminal laws of the United States. In particular, I have investigated violent crimes including armed bank robberies, armored car robberies, car-jackings, sexual assaults, attempted murders, threats against persons, shootings, and commercial robberies. I have gained knowledge in the use of various investigative techniques including the utilization of physical

surveillance, undercover agents, confidential informants and cooperating witnesses, and investigative interviews. I have served Administrative and Grand Jury Subpoenas, as well as, analyzed telephone pen register and caller identification system data, and the execution of search and arrest warrants. Through instruction and participation in investigations, I have become familiar with DNA analysis. Based on my training and experience, I understand that each person has a unique DNA composition. DNA isolated from blood, hair, skin cells, or other genetic evidence left at the scene of a crime can be compared with the DNA of an individual to identify an individual as a potential suspect.

3. This affidavit is based, in part, upon information provided to me by other Special Agents of the FBI, Task Force Officers and officers of the Washington, D.C. Metropolitan Police Department (MPD), witnesses, physical surveillance, and other information gathered during the course of this investigation. Since this affidavit is being submitted for the limited purpose of obtaining a search warrant for the execution of a buccal swab, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts which I believe are necessary to establish probable cause for the issuance of this search warrant.

4. As a result of my personal participation in this investigation, as well as through interviews with and analysis of reports submitted by other Special Agents and Task Force Officers of the FBI and officers of the MPD who are involved in this investigation, I am familiar with all aspects of this investigation.

5. On the basis of this familiarity, and on the basis of other information which I have reviewed and determined to be reliable, I allege the facts to show there is probable cause to believe that evidence of offenses involving an attempted bank robbery, in violation of Title 18, United States Code, § 2113(a), will be found located in the cheek cells/saliva (buccal swab) of

Kevin Aguilar, DOB 06/12/1992, PDID No. 623621.

## THE INVESTIGATION

6. As discussed below, the investigation revealed that, on June 24, 2016, at approximately 3:43 PM, KEVIN AGUILLAR attempted to rob the BB&T Bank located 601 13th Street NW, Washington, D.C.

7. On June 24, 2016, at approximately 3:45 p.m., law enforcement officers received a report of an attempted bank robbery at BB&T Bank, located at 601 13th Street NW, Washington, D.C.

8. Officers responded and interviewed the bank teller, who provided the following information after reviewing bank surveillance footage. The teller stated that the suspect, S-1, entered the bank, gestured toward a table that held the deposit slips, and walked to the table. S-1 then approached the teller's workstation and passed the teller a note. The note demanded $5,000. S-1 then verbally stated "Give me $5000" and threatened to shoot the teller if the teller did not comply by the count of three. As S-1 began to count, the teller pressed an alarm, and S-1 fled the bank. S-1 fled the bank without obtaining any money. The teller described S-1 as a Hispanic male, with Hispanic accent, perhaps not knowing much English, 5' to 5'2" tall, mid to late 20's, small to medium build, with a mustache, and brown hair pulled back in a bun. The teller stated that S-1 was wearing a dark baseball cap with distinctive writing, sporty full-frame reflective blue sunglasses, vibrant blue and white horizontally thin striped short-sleeve polo and dark pants.

9. After reviewing bank surveillance footage, officers confirmed the teller's account and obtained a clear visual depiction of S-1 and his clothing. Officers also observed that S-1 appeared to write on a deposit slip and left the demand note with the teller. Officers collected

both the deposit slip and demand note, and later submitted both items for forensic testing. As noted below, two of AGUILAR's palm prints were found on the deposit slip; AGUILAR's fingerprint was found on the demand note.

10. Officers canvassed the bank's surrounding area for additional surveillance footage and located pertinent footage at Metro Center metro station, approximately 700 feet from the bank. Upon review of the Metro Center footage, officers learned that S-1 ran down the escalators at Metro Center within approximately a minute of the attempted robbery. S-1 was no longer wearing a hat and sunglasses when he ran into Metro Center, but was holding an unidentified object in his hand. S-1 dropped the unidentified object into a metro trashcan.

11. S-1 subsequently boarded a redline train towards Woodley Park metro station. Officers later reviewed railcar surveillance footage showing that S-1 departed the train at Woodley Park at approximately 3:53 p.m. Officers observed a clear facial and frontal view of S-1 as he departed the train. S-1 was not wearing the hat or sunglasses when he boarded or departed the train.

12. The same day of the attempted robbery officers interviewed a metro custodian who collected trash from the same trashcan where S-1 dropped the unidentified object. The metro custodian stated that it found a hat and sunglasses in the trashcan. Officers recovered the hat and sunglasses. Those items appeared to be the same hat and sunglasses that S-1 was wearing during the attempted bank robbery. Officers submitted both items for forensic testing.

13. The same day of the attempted robbery, at approximately 5:24 p.m., officers stopped AGUILAR in the Columbia Heights area of Washington, D.C. Officers stopped AGUILAR based on CSOSA GPS information that placed AGUILAR near the bank during the attempted robbery. (Officers later learned that AGUILAR's GPS information also placed

AGUILAR near Metro Center and Woodley Park metro stations consistent with S-1's flight path.) CSOSA GPS information indicated that there were five individuals on GPS monitoring in the bank area in the minutes before the attempted robbery. AGUILAR was 186 feet away from the bank two minutes before the robbery. The remaining four individuals were at least 600 feet away.

14. During the stop officers noted that AGUILAR's physical appearance was similar to S-1. AGUILAR was a Hispanic male, standing approximately 5'4", and had a similar build to S-1. AGUILAR also had a mustache similar to S-1. Although AGUILAR's hair was not in a ponytail when officers stopped him, AGUILAR's hair appeared similar in color to S-1's hair and AGUILAR's hair appeared capable of being placed in a ponytail similar to S-1's. AGUILAR was no longer wearing the blue shirt that S-1 wore, but AGUILAR's jeans and shoes appeared to match S-1's clothing.

15. Officers brought the teller to Columbia Heights for a show-up identification. Upon viewing AGUILAR the teller stated "I don't think that's him. He had on sunglasses. I didn't have full facial recognition. His hair looks darker. It's not the right kind of hair."

16. Later that day, officers interviewed two of AGUILAR's co-workers and showed them still images of the bank surveillance footage where S-1 was wearing the hat and sunglasses. Both co-workers stated that AGUILAR was not S-1. One co-worker stated that S-1 was heavier, had lighter skin, and had a mustache different from AGUILAR. Officers then showed both co-workers a photograph of AGUILAR from the earlier show-up identification. Upon viewing the show-up photograph, both co-workers acknowledged that AGUILAR had the same mustache as S-1.

17. On June 27, 2016, officers interviewed W-1. W-1 stated that AGUILAR's co-

workers contacted W-1 and told W-1 that AGUILAR was a suspect in a bank robbery. W-1 became concerned because AGUILAR had asked W-1 for money the morning of the attempted robbery. W-1 had also noted that AGUILAR acted strange when W-1 saw AGUILAR after the attempted robbery, and that AGUILAR shaved his mustache the day after the robbery. W-1 further noted that AGUILAR removed his GPS bracelet the day after the robbery (officers verified that AGUILAR removed his GPS device the day after the robbery and that AGUILAR ultimately pled guilty to removing the device in D.C. Superior Court Case 2016 CMD 10785). W-1 notified the police when W-1 saw wanted photographs from the attempted robbery and believed that S-1 was AGUILAR.

18. During the interview, officers showed W-1 the same wanted photographs. The wanted photographs were still images from the bank surveillance footage where S-1 was wearing the hat and sunglasses. Upon viewing the wanted photographs during the interview W-1 expressed doubt about whether S-1 was AGUILAR. In the middle of the interview, W-1 stated "it's not" AGUILAR. However, after continuing to look at the wanted photographs, W-1 later stated, "It looks like maybe it's him, I don't know if it's him."

19. Officers had not reviewed the railcar metro footage, which depicts a facial and frontal view of S-1 without the hat and sunglasses, before the co-worker and W-1 interviews. To date neither the co-workers, nor W-1 have seen the railcar footage. Two officers who saw AGUILAR during the show-up have compared the railcar footage to the show-up photograph. Both officers identified AGUILAR as S-1 in the railcar footage.

20. On September 2, 2016, the FBI received fingerprint results from the deposit slip and demand note. The lab found two palm prints matching AGUILAR on the deposit slip. The lab found one fingerprint matching AGUILAR on the demand note.

21. On October 28, 2016, the FBI received DNA results from the hat and sunglasses recovered in the metro trashcan. The lab did not obtain any results from the glasses. The lab detected male DNA in a mixture profile that is suitable for comparison from the recovered hat.

22. AGUILAR does not have an identical twin known to the affiant. Accordingly, the government is seeking this search warrant to obtain a known DNA sample from AGUILAR for comparison with the male profile identified from the recovered hat.

**<u>CONCLUSION</u>**

23. Based upon these facts, there is probable cause to believe that evidence of an attempted bank robbery, in violation of Title 18, United States Code, § 2113(a), will be found in the cheek cells/saliva (Buccal Swab) of KEVIN AGUILAR, DOB 06/12/1992, PDID#623621.

Respectfully submitted,

____________________________________
CHAD M. FLEMING
Special Agent, Federal Bureau of Investigation

Subscribed and sworn to before me this ______ of April, 2017.

____________________________________
DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE